IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Kenneth Allen Carson | Crim. No. 4:02-cr-00813-TLW-1 |
| v. | **ORDER** |
| United States of America | |

This matter comes before the Court for consideration of Defendant Kenneth Allen Carson's *pro se* motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). ECF Nos 310 & 311.[1] For the reasons below, his motion is denied.

## BACKGROUND

On October 22, 2002, Carson was charged in a three-defendant, five-count indictment with armed bank robbery (Count 1); using and carrying a firearm during a crime of violence (Count 2); and being a felon in possession of a firearm (Count 3). ECF No. 23. He pled guilty to all three counts. ECF No. 66. At sentencing in February 2004, the Court first granted the Government's motion for upward departure before sentencing Carson to 276 months on Counts 1 and 3, and 84 months consecutive on Count 2, for a total aggregate sentence of 360 months incarceration, followed by concurrent 5-year terms of supervised release on each count. ECF No. 84. The Court found that an upward departure was warranted to both take into account Underhill's significant criminal history and the likelihood he would commit further crimes. ECF No. 78. Carson filed a direct appeal, and the

---

[1] These two documents were filed contemporaneously. Accordingly, the Court will construe them together as one motion.

United States Court of Appeals for Fourth Circuit affirmed both his convictions and sentence. *United States v. Carson*, 164 F. App'x 433 (4th Cir. 2006).

In January 2007, Carson timely filed a *pro se* petition under for habeas corpus pursuant to 28 U.S.C. § 2255. ECF No. 99. The Court denied relief and dismissed the petition on the merits after receiving briefing from both Carson and the Government. ECF Nos. 99, 122. Carson filed an appeal, but the Fourth Circuit dismissed the appeal for failure to prosecute. ECF No. 129; *United States v. Carson*, No. 09-6509 (4th Cir.), ECF No. 8.

In March 2016, as required by 28 U.S.C. § 2244, Carson filed a motion in the Fourth Circuit requesting authorization to file a successive § 2255 petition to seek resentencing following *Johnson v. United States*, 135 S. Ct. 2551 (2015). *In re Carson*, No. 16-261 (4th Cir.), ECF No. 2. On May 3, 2016, the Fourth Circuit granted his motion. *Id.*, ECF No. 11-1. His § 2255 petition was docketed in this Court that day. ECF No. 145.

In his § 2255 petition, Carson sought a full resentencing in light of *Johnson*'s effect on his status as an armed career criminal. *Id.* The Government filed a response in opposition, to which Carson replied. ECF Nos. 204 & 205. On September 10, 2019, the Court entered an order denying relief on Carson's second § 2255 petition. ECF No. 262. In its order, the Court found that his petition was untimely as to his request for resentencing as to Counts 1 and 2 and that, under the concurrent sentence doctrine, he was not entitled to a resentencing as to Count 3. ECF No. 262. Carson appealed the Court's denial of his § 2255 petition, and the

Fourth Circuit dismissed Carson's appeal, denying him a certificate of appealability. ECF Nos. 269 & 301.

Carson filed the present motion for compassionate release on September 15, 2022. ECF Nos. 310 & 311. The Government opposes his motion, and Carson has replied to the Government's opposition. ECF Nos. 318 & 320. Accordingly, this matter is ripe for review, adjudication, and disposition.

## APPLICABLE LAW

Without certain exceptions, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). One of those exceptions is the compassionate release statute. That statute provides:

> [T]he court, . . . upon motion of the defendant . . . , may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) . . . , if it finds that—(i) extraordinary and compelling reasons warrant such a reduction; . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). "A defendant who seeks compassionate release under § 3582(c)(1)(A)(i) has the burden of establishing that such relief is warranted." *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).

The Sentencing Commission has issued a policy statement addressing compassionate release motions—§ 1B1.13. But before the passage of the First Step Act, compassionate release motions could be filed only by the Bureau of Prisons ("BOP"), so § 1B1.13 by its terms only applies to BOP motions. *See United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020) (explaining the First Step Act's changes to the compassionate release statute). There is no corresponding policy

statement addressing compassionate release motions filed by inmates. Thus, in *McCoy*, the Fourth Circuit held that, when considering an inmate's compassionate release motion, § 1B1.13 is not an "applicable policy statement[]." *Id.* at 284. But while § 1B1.13 may not directly apply to an inmate's motion, "it remains helpful guidance." *Id.* at 282 n. 7.

While § 1B1.13 may provide guidance, it is not an "applicable policy statement[]," so "district courts are 'empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *United States v. Zullo*, 976 F.3d 228, 230 (2d. Cir. 2020)) (emphasis in original); *see also United States v. Kibble*, 992 F.3d 326 (4th Cir. 2021). Ultimately, the determination of whether a case presents extraordinary and compelling reasons warranting a sentence reduction is a reduction is a question first determined within the sound discretion of the district court.

## DISCUSSION

To provide context to both Carson's motion and the Court's decision, the Court will first review the offense conduct establishing Carson's present incarceration before reviewing the parties' arguments and conducting its own analysis of the issues at play.

### I.   THE OFFENSE CONDUCT AND CARSON'S SENTENCE

This case involves a violent armed bank robbery, which was planned by Carson and committed him with the assistance of two codefendants. The offense conduct is set forth in detail in paragraphs 6–19 of the Presentence Investigation

Report ("PSR") filed in this case. That conduct will be outlined here.

On the morning of September 30, 2002, Carson approached James Earl Martin and requested his help to "do a deal," *i.e.*, to commit a robbery. PSR ¶ 30. Carson told Martin that to "do [the] deal" they would need the assistance of one other person as well as two vehicles. *Id.* Martin believed that Carson intended to rob a drug dealer and connected Carson with Freddie Prophet. *Id.* ¶ 12. After agreeing to assist in the robbery, Prophet left to get a second vehicle, returning with a stolen car. *Id.* The Carson, Prophet, and Martin then left in both Carson's car and the stolen car to go commit the robbery in Florence, South Carolina. *Id.*

On the way to Florence, the three stopped at a gas station to buy stocking caps to hide their identities during the robbery. *Id.* When they arrived in Florence, the three waited in the parking lot of a Kmart store for their drug dealer mark to appear. *Id.* ¶ 13. To pass the time, Carson showed Martin and Prophet the gun he intended to use to complete the robbery. *Id.* Eventually, Carson grew impatient and decided that the three should rob a nearby branch of the National Bank of South Carolina. *Id.* Martin and Prophet agreed with this idea and abandoned the plan to rob a drug dealer. *Id.*

The three then left the Kmart and drove to the bank in Carson's car in order to scout it out. *Id.* When they arrived, Carson instructed Prophet to go inside and exchange money for quarters so that he could determine number of people in the bank and ascertain whether security guards were present. *Id.* After Prophet reported back that the bank was a safe target, the three returned to the Kmart

parking lot and got in the stolen vehicle. *Id.* Prophet, now designated as the group's getaway driver, then drove Martin and Carson back to the bank in the stolen vehicle. *Id.*

When they returned, Carson and Martin donned the stockings caps over their faces to hide their identities. *Id.* Carson entered the bank wielding his gun, frightening employees, and customers. *Id.* He then handed the gun to Martin and told him to watch his back while he grabbed cash. *Id.* As instructed, Martin then pulled one employee through the lobby before holding the gun on the other employees. *Id.* ¶¶ 8 & 13. At the same time, Carson approached the teller's counter, vaulted over it, and began placing money in a bag. *Id.* ¶ 13. He repeatedly told the teller "don't look at me," "stay where you are," and "don't move." *Id.* ¶ 8. Ultimately, he stole $41,000.00 from the teller's counter. *Id.* ¶ 8. After securing the money, Carson and Martin fled the bank to Prophet's waiting get away car. *Id.* ¶ 9.

Prophet drove the stolen vehicle back to the Kmart. *Id.* As he drove, Carson and Martin began pouring gasoline throughout the vehicle. *Id.* At the Kmart, they moved the money from the stolen vehicle to Carson's vehicle before setting the stolen vehicle on fire as a diversion. *Id.* The car exploded, and Carson, Martin, and Prophet fled in Carson's car. *Id.*

A bystander saw the three robbers attempting to set the stolen vehicle on fire and called 911. *Id.* The Florence Police Department promptly responded and followed the second getaway car. *Id.* The three robbers then initiated a dangerous highspeed chase through traffic lights and down Interstate 95. *Id.* The chase ended

when Carson's car crashed into a fence along the interstate. *Id.* Carson, Martin, and Prophet exited the vehicle, jumped over the fence, and fled into a nearby wooded area. *Id.* Officer's uncovered $ 35,600.00 in cash from the wreck along with Carson's firearm, which turned out to be a stolen, fully loaded .357 revolver. *Id.*

The Florence Police Department surrounded the area and locked down nearby businesses, two local high schools, and the adjacent neighborhood. *Id.* ¶ 10. The Florence County Sherriff's Office responded with a dog tracking team, which located Carson and Martin after a three-hour search. *Id.* A helicopter unit of the South Carolina Law Enforcement Division was called in to assist in finding Prophet. *Id.* He was eventually located hiding in the woods and was apprehended with $5,700.00 in cash in his possession. *Id.*

Carson was indicted on October 22, 2002. ECF No. 1. He pled guilty to all three counts in the Indictment. ECF No. 68. On February 26, 2004, the Court sentenced him to 276 months on Counts 1 and 3, and 84 months consecutive on Count 2, for an aggregate sentence of 360 months incarceration, followed by concurrent 5-year terms of supervised release on each count. ECF No. 84.

## II.   THE PARTIES' ARGUMENTS

Before addressing the merits of Carson's motion for compassionate release, the Court will first review the arguments asserted by both Carson and the Government. *See* ECF Nos. 310, 311, 318 & 320.

### A.   *Carson's Arguments in Support of His Motion*

Carson requests that the Court grant his motion for compassionate release and order his immediate release based on his belief that he can establish "extraordinary and compelling" reasons in favor of his release as required by § 3582. ECF Nos. 310 & 311. Specifically, Carson asserts that he is entitled to release because the risk posed by the COVID-19 pandemic constitute an "extraordinary and compelling reason" when coupled with his asserted medical conditions. ECF No. 310 at 1–2. Additionally, he also asserts that he is serving a disparate sentence based on the fact that he would be facing a lower sentencing range today. *Id.* at 5–8. Finally, he posits that the 18 U.S.C. § 3553(a) sentencing factors do not weigh against his request for his immediate release from imprisonment. *Id.* at 4–10.

### B.    *The Government's Opposition*

The Government opposes Carson's motion on two independent grounds. ECF No. 318. First, the Government asserts that Carson cannot establish "extraordinary and compelling reasons" under § 3582. *Id.* at 10. Second, and alternatively, the Government argues that, even if Carson could meet the "extraordinary and compelling reason" standard, the 18 U.S.C. § 3553(a) sentencing factors weigh against both a reduction in his sentence and his release. *Id.* In particular," the Government notes that, if released, Carson would pose a significant danger to the community. *Id.*

### III.    THE COURT'S REVIEW

Carson has satisfied the administrative exhaustion requirement because 30 days have passed since he filed a request for compassionate release with the warden

of his detention facility. ECF No. 310 at 4. Therefore, the Court must determine (1) whether Carson has established the existence of "extraordinary and compelling reasons" for a sentence reduction under § 3582(c)(1)(A), and (2) if so, whether granting compassionate release is consistent with the sentencing factors set forth in § 3553(a).

### A.  The "Extraordinary and Compelling Reasons" Standard

Carson's motion asserts a single ground for establishing "extraordinary and compelling reasons" for relief: that his asserted medical conditions, when coupled with the risks presented by the COVID-19 pandemic, warrant his immediate release from custody. ECF No. 310 at 1–2. However, in his argument related to the § 3553(a) factors, Carson asserts that he is serving a disparately long sentence based on his assertion that he would no longer be an armed career criminal if sentenced today. *Id.* at 5–8. Accordingly, he posits that the sentence he is currently serving is significantly longer than the sentence he would receive today. *Id.* Although Carson raises this argument in addressing the § 3553(a) factors, the Court finds it appropriate for consideration under § 3582's "extraordinary and compelling reason" standard. The Court will address each of these argument in turn.

### i.  *The threat of COVID-19 does not present an "extraordinary and compelling reason" warranting a reduction in Carson's sentence.*

Carson's first argument asserts that he can establish "extraordinary and compelling reasons" based on his asserted medical risks when coupled with the risks presented by the COVID-19 pandemic. Carson states that he suffers from "several orthopedic maladies, diabetes Type II Mellitus, Hepatitis C, Hypertension,

[and] symptoms of *possible* Colon Cancer [.]" ECF No. 310 at 1 (emphasis added). Further, he suggests that he "*could* be diagnosed with chronic obstructive pulmonary disease." *Id.* at 2 (emphasis added). After reviewing the parties' arguments in conjunction with Carson's medical records, the Court concludes that he has not shown that the COVID-19 pandemic, when coupled with his asserted medical conditions, presents an "extraordinary and compelling reason" warranting either a reduction in his sentence or his release.

"The COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction." *United States v. Walker*, No. 3:20-CR-107-MOC-3, 2022 WL 1462270, at *3 (W.D.N.C. May 9, 2022); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."). This conclusion holds especially true following the introduction of several effective COVID-19 vaccines. Although the Fourth Circuit has so far not established a *per se* rule that the availability of the COVID-19 vaccine precludes compassionate release, courts in this district have held that, "[f]or the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release." *United States v. Henry*, No. CR 3:17-00640-MGL-4, 2022 WL 16541161, at *2 (D.S.C. Oct. 28, 2022) (quoting *United States v. Broadfield*, 5

F.4th 801, 803 (7th Cir. 2021)) (internal quotations omitted); *United States v. Wolfe*, No. 6:18-CR-00582-DCC-1, 2022 WL 1204840, at *5 (D.S.C. Apr. 21, 2022); *United States v. Raap*, No. 8:18-CR-00678-DCC-1, 2021 WL 2328048, at *3 (D.S.C. June 8, 2021). Accordingly, "[f]ollowing full vaccination, it is now well understood, both the likelihood of contracting COVID-19 and the associated risks should one contract the virus are significantly reduced so that an inmate largely faces the same risk from COVID-19 as those who are not incarcerated." *United States v. McBride*, No. 2:09-CR-01223-DCN-1, 2023 WL 207330, at *3 (D.S.C. Jan. 17, 2023) (citations omitted). Based on this authority, the Court concludes that the risk of COVID-19 alone no longer provides a strong, persuasive basis for Carson to establish "extraordinary and compelling reasons" pursuant to § 3582.

This conclusion is buttressed by the fact that Carson has been repeatedly vaccinated against COVID-19. ECF No. 318–1. According to records provided by the Government, Carson received the Pfizer-BioNTech vaccine on March 16, 2021, and on April 6, 2021. *Id.* He was also boosted with the Moderna vaccine on October 26, 2021. *Id.* The Court notes that, given the availability of vaccines within the BOP, "an inmate largely faces the same risk from COVID-19 as those who are not incarcerated." *United States v. McBride*, No. 2:09-CR-01223-DCN-1, 2023 WL 207330, at *3 (D.S.C. Jan. 17, 2023) (citations omitted). Thus, it is appropriate to conclude that the risks posed to Carson by COVID-19 are no more significant while incarcerated than they would be if he were released.

Furthermore, Carson has not asserted that his medical conditions are being

left untreated by the BOP, which is capable of providing him effective medical care. In fact, the Court has thoroughly reviewed his medical records, which he submitted as an exhibit. *See* ECF No. 310–1. The Court did so to evaluate his asserted medical conditions of (1) orthopedic maladies, (2) Type 2 Diabetes, (3) Hepatitis C, (4) Hypertension, (5) possible Colon Cancer, and (6) possible chronic obstructive pulmonary disease. As indicated by these records—again, provided by Carson—the BOP is effectively treating his medical conditions. His Type 2 Diabetes and Hypertension are managed through medication provided by the BOP. *Id.* at 7–9, 13–14. His orthopedic issues are being treated through treatment and medication. *Id.* at 7 & 14. Regarding his Hepatitis C diagnosis, treatment notes reflect that the BOP's "Hep C treatment (Aug, 2019) has been *successful* [.]" *Id.* at 9 (emphasis added). In summary, as illustrated by records from the BOP's Chronic Care Clinic, Carson is "doing fairly well clinically, and is compliant with all meds, diet & exercise as much as possible." *Id.* at 9. These conditions thus do not establish "extraordinary and compelling reasons" warranting either a reduction in Carson's sentence or his release.

The Court has also carefully analyzed Carson's assertion that he potentially has Colon Cancer. None of the records he has provided support this allegation. The only record mentioning Colon Cancer relates to Carson's 2020 request for treatment of various "gastrointestinal complaints." *Id.* at 12. In treating Carson, a BOP physician evaluated him and noted that he likely had "either diverticular or colitis." *Id.* However, the physician further noted that, at the other end of the diagnostic

spectrum, "Colon cancer is a *possibility*." *Id.* (emphasis added). Accordingly, the physician recommended a colonoscopy to further evaluate the issue. *Id.* Despite this recommendation, Carson *refused treatment* and signed a waiver form memorializing his refusal. *Id.* at 11. Although the Court accepts Carson's right to refuse treatment, it cannot ignore the inconsistency of petitioning for compassionate release based on the risk of possible Colon Cancer while also refusing a highly effective medical procedure to properly evaluate that risk. "In short, [a defendant] may not manufacture his own 'extraordinary and compelling' circumstance." *United States v. Griffin*, No. 4:18-CR-00089-DCC-1, 2021 WL 4411773, at *3 (D.S.C. Sept. 27, 2021). Similarly, there is no evidence that Carson has continued to suffer gastrointestinal issues or any other issue indicative of "possible Colon Cancer." Carson's speculative assertion alone does not rise to establishing "extraordinary and compelling reasons" warranting either a reduction in his sentence or his release.

Finally, the Court has reviewed Carson's records for evidence of his potential diagnosis of chronic obstructive pulmonary disease. The records do not provide any evidence or finding that he has any significant issue as a result of this undiagnosed medical condition. This potential, unconfirmed condition does not provide a basis that would warrant Carson's release in this case.

The record before the Court establishes that Carson's medical conditions are (1) being properly and appropriately treated by the BOP, or (2) either too speculative or nonexistent. Accordingly, based on the Court's careful review of Carson's medical records, it concludes that Carson's asserted medical conditions,

even independent of the COVID-19 pandemic, do not rise to establishing "extraordinary and compelling reasons" in favor of relief. However, even if the threats presented by COVID-19 and Carson's asserted medical conditions were "extraordinary and compelling reasons" for relief, based on the reasons set forth in this order, the Court would still deny Carson's request for release.

ii.    _If sentenced today, Carson would no longer be an armed career criminal._

Carson next argument for his compassionate release relates to his status as an "armed career criminal" under the Armed Career Criminal Act ("ACCA"). ECF No. 310 at 4–8. Specifically, he asserts that, if sentenced today, he would no longer be considered an armed career criminal in light of intervening caselaw. *Id.* He therefore requests the Court to "consider the unwarranted sentencing disparity between Mr. Carson and similarly situated offenders situated today." *Id.* at 5. Additionally, Carson argues that his "ACCA label should not apply as a result of *Johnson* [.]"

Before addressing Carson's arguments, the Court will provide some necessary background on the ACCA. Congress enacted the ACCA to protect society from "those who commit a large number of fairly serious crimes as their means of livelihood" because those people "are especially likely to inflict grave harm when in possession of a firearm." *Wooden v. United States*, 142 S. Ct. 1063, 1074 (2022) (cleaned up). The "statute mandates a 15-year minimum sentence for unlawful gun possession when the offender has three or more prior convictions for violent felonies like burglary committed on occasions different from one another." *Id.* at 1067

(cleaned up); see 18 U.S.C. § 924(e)(1).

In *Johnson v. United States*, the United States Supreme Court held that the "residual clause" of the ACCA was unconstitutionally vague and that "imposing an increased sentence under the residual clause of the [ACCA] violates the Constitution's guarantee of due process." *Johnson*, 135 S.Ct. at 2555–63. The Act provides for enhanced penalties for those with three qualifying prior felony convictions for either serious drug offenses or "violent felonies." The ACCA defines a "violent felony" as a crime punishable by imprisonment for a term exceeding one year "that -- (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*." 18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added). The italicized portion above is known as the ACCA's "residual clause." The Supreme Court determined the ACCA's "residual clause" to be unconstitutionally vague because its application was too "wide-ranging" and "indeterminate." *Id.*

With this background in mind, the Court turns to Carson's request that the Court conclude his "ACCA label should not apply as a result of *Johnson* [.]" ECF No. 310 at 6. To the extent this request asserts that a sentence reduction is warranted because of an asserted error in the calculation of Carson's Guidelines range when he was sentenced, the Court denies this request. The Court finds there was no error in his Guidelines calculations when they were originally calculated. Additionally, the Court notes the Fourth Circuit has held that, because "habeas is the exclusive

method of collaterally attacking a federal conviction or sentence" in cases where the defendant argues it was invalid upon imposition and absent First Step Act relief eligibility, "a criminal defendant is foreclosed from the use of another mechanism, such as compassionate release, to sidestep" the habeas requirements. *United States v. Ferguson*, 55 F.4th 262, 270 (4th Cir. 2022). Thus, in light of *Ferguson*, a motion for compassionate release is not the preferred basis to challenge an alleged Guidelines error related to Carson's status as an armed career criminal in the aftermath of *Johnson*.[2] *See United States v. Thompson*, No. 1:12-CR-434, 2023 WL 4459604, at *3 (M.D.N.C. July 11, 2023) (finding that defendant's Guidelines challenge in a § 3582 motion to his armed career criminal status was not cognizable outside of § 2255); *United States v. Tillman*, No. CR 1:07-1250-MGL-1, 2023 WL 3231520, at *4 (D.S.C. May 3, 2023) (same); *United States v. Brewster*, No. 16-CR-220, 2023 WL 2656564, at *2 (W.D.N.C. Mar. 27, 2023) (same). However, to the extent that Carson argues that *Johnson* resulted in a disparity between the sentence he received and the one he would receive today, the Court will consider his disparity argument in connection with his motion for compassionate release. *See McCoy*, 981 F.3d at 274–75 (noting statutory changes in mandatory minimums that occur after sentencing and do not apply retroactively are an appropriate basis for a sentence reduction, when combined with other factors).

As noted, Carson was sentenced as an armed career criminal under the ACCA. Again, the ACCA provides that a defendant convicted of being a felon in

---

[2] As noted above, the Court specifically addressed *Johnson* in adjudicating Carson's second § 2255 petition.

possession of a firearm who has at least three prior convictions for "a violent felony or a serious drug offense" faces a mandatory minimum of 15 years' incarceration. 18 U.S.C. § 924(e)(1). Based on the Court's review, when Carson was originally sentenced, the following South Carolina convictions were counted as "violent felonies": (1) failure to stop for a police vehicle, (2) assault and battery of a high and aggravated nature ("ABHAN"), (3) burglary 2nd, (4) burglary 3rd, and (5) a second ABHAN conviction. PSR ¶¶ 50–55. If Carson were before the Court today for his initial sentencing, he would not be classified as an armed career criminal under the current state of the law as the convictions cited above would not count as ACCA predicates. *See Mathis v. United States*, 136 S. Ct. 2243, 2250–51 (2016) (concluding that Iowa burglary is categorically overbroad); *Johnson*, 135 S. Ct. at 2563 (concluding that the residual clause is unconstitutionally vague); *United States v. Hall*, 684 F. App'x 333, 335–36 (4th Cir. 2017) (applying *Mathis* to conclude that South Carolina burglary is categorically overbroad); *United States v. Hemingway*, 734 F.3d 323, 335 (4th Cir. 2013) (concluding that ABHAN is categorically overbroad). Given that Carson would no longer qualify as an armed career criminal today, the Court will compare his Guidelines at sentencing to those he would be facing today to determine whether a disparity that would warrant relief exists.

The 2002 edition of the Guidelines Manual was used to calculated Carson's Guidelines at sentencing. PSR ¶ 21. Count 1 (armed bank robbery) and Count 3 (felon in possession) were grouped together pursuant to U.S.S.G. § 3D1.2 & 3, with

the Count with highest offense level controlling. *Id.* ¶¶ 22; 37. For Count 1, Carson received a base offense level of 20. PSR ¶ 25. He then received a two-level enhancement for robbing a financial institution pursuant to U.S.S.G. § 2B1.1(b)(1), a two-level enhancement for restraining a person during the robbery pursuant to U.S.S.G. § 2B1.1(b)(4)(B), a one level enhancement for stealing more than $10,000.00 but less than $50,000.00 pursuant to U.S.S.G. § 2B3.1(b)(7)(B), and a two-level enhancement for obstruction of justice arising out of his reckless endangerment during flight pursuant to U.S.S.G. § 3C1.2. *Id.* ¶¶ 24–25; 28. This brought Carson's adjusted offense level to 27 for Count 1. *Id.* ¶ 29.

For Count 3 (felon in possession), Carson received a base offense level of 24 pursuant to U.S.S.G. §2K2.1(a). *Id.* ¶ 31. His base offense level was driven by three of his prior felony convictions for "crimes of violence." *Id.* Carson then received a two-level enhancement pursuant to U.S.S.G. § 2K1.1(b)(4) because the firearm used during the robbery was stolen. Id. ¶ 32. He again received a two-level enhancement for obstruction of justice arising out of his reckless endangerment during flight pursuant to U.S.S.G. § 3C1.2. *Id.* ¶ 35. This brought Carson's adjusted offense level for Count 1 to 28. *Id.* ¶ 36. Thus, as the highest offense level in the group, it controlled. *Id.* ¶ 28.

The PSR also took into account Carson's significant criminal history. Because of his prior convictions, Carson was placed in the highest a criminal history category of VI even before the career offender enhancement was applied. *Id.* ¶ 56–59. Carson was assigned 21 criminal history points based on his prior convictions.

*Id.* This was 8 more points then necessary to place him in a criminal history category of VI.

Because Carson was deemed an armed career criminal, his total offense level was automatically increased to 34 pursuant to U.S.S.G. § 4B1.4(b)(3)(A). *Id.* ¶ 28. He then received a two-level reduction for acceptance of responsibility, resulting in a total offense level of 32. *Id.* ¶ 32. Because of his armed career criminal status, Carson was assigned a criminal history category of VI pursuant to U.S.S.G. § 4B1.4(c). *Id.* ¶ 60. A total offense level of 32, when paired with a criminal history category of VI, resulted in a Guidelines range of 210–262 on Counts 1 and 3. *Id.* ¶ 101. *Id.* As noted, the Court granted the Government's motion for upward departure at sentencing and departed two-levels, which resulted in a total offense level of 34 and a Guidelines range of 262 to 327 months. ECF No. 82. The Court sentenced Carson to 276 months on Counts 1 and 3, and 84 months consecutive on Count 2, for an aggregate sentence of 360 months incarceration,

Today, Carson's sentence would be calculated with the 2021 edition of the Guidelines Manual. Counts 1 and 3 would again be grouped together pursuant to U.S.S.G. § 3D1.2 & 3, with the highest offense level controlling. The Court begins with Count 1 (armed bank robbery). Carson would receive a base offense level of 20. U.S.S.G. § 2B3.1(a). He would then receive a two-level enhancement based on his robbery of a financial institution. U.S.S.G. § 2B3.1(b)(1). Next, he would receive a two-level enhancement because a person was restrained during the robbery. U.S.S.G. § 2B1.1(b)(4)(B). A further one-level enhancement would be applied

because more than $20,000.00 but less than $95,000.00 was stolen. U.S.S.G. § 2B1.1(b)(7)(B). A final two-level enhancement would be applied based on Carson's reckless endangerment of others during his flight. U.S.S.G. § 3C1.2. These enhancements would result in a total adjusted offense level of 27 for Count 1.

Turning to Carson's recalculated Guidelines for Count 3. Because Carson today would no longer have the requisite ACCA predicates, his base offense level would be 14. U.S.S.G. § 2K1.1(a)(6). Since the firearm used in the robbery was stolen, Carson would receive an additional two-level enhancement, and he would again receive a final two-level enhancement based on his reckless endangerment of others during his flight. U.S.S.G. § 2K1.1(b)(4); U.S.S.G. § 3C1.2. These enhancements would result in a total adjusted offense level of 18 for Count 3.

Today, because Count 1 has the highest offense level, it would control. Applying the same two-level adjustment for acceptance of responsibility would result in a total offense level of 25.[3] If sentenced today, Carson would have 18 criminal history points based on his substantial criminal history. U.S.S.G. § 4A1.1; PSR ¶¶ 43–55. This significant number of criminal history points would place him in the highest criminal history category of VI. However, Carson would receive a two-point adjustment because he committed the instant offenses while on probation for his ABHAN conviction. U.S.S.G. § 4A1.1(d); PSR ¶ 57. This would result in a criminal history score of 20, again placing him in the highest criminal history category of VI.

---

[3] The United States Probation Office has assisted the Court in recalculating Carson's Guidelines.

With a criminal history category of VI and a total offense level of 25, Carson would be facing a Guidelines range of 110-137 months on Counts 1 and 3 today. However, applying the same upward departure of two levels would result in a total offense level of 27 and a Guidelines range of 130 to 162 months to be followed by a minimum consecutive sentence of 84 months. Based on these calculations, there would be a disparity between the sentence Carson received on Counts 1 and 3 and the sentence he could receive today on these same counts.

Additionally, based on his plea to the § 924(c) charge in Count 2, Carson would still receive a consecutive sentence of 84 months—at a minimum—today. Adding § 924(c)'s 84-month mandatory minimum to the Guidelines range for Counts 1 and 3 would result in a total Guidelines range of 214 to 246 months. However, as discussed in more detail in the Court's analysis of the 18 U.S.C. § 3553(a) sentencing factors, the 84-month consecutive sentence under § 924(c) is only the statutory mandatory *minimum*. The maximum consecutive sentence on Count 2 is Life. Thus, if sentence today, the full potential sentencing range Carson would face would be from 246 months *minimum* to a *maximum* of Life.

As noted, the Fourth Circuit and numerous district courts have held that a disparity in the sentence a defendant received and the one he would be facing today may constitute "extraordinary and compelling reasons." *McCoy*, 981 F.3d at 271; *see also United States v. Brown*, ____F.4th____, 2023 WL 5257673 at *7 (4th Cir. Aug. 16, 2023) (noting that "§ 3582(c)(1)(A) allow for 'individual relief' based on a § 924(c) sentencing disparity 'in the most grievous cases."). Accordingly, the Court concludes

that Carson arguably meets § 3582's "extraordinary and compelling reason" standard based on the *potential* disparity between the sentence he received and the one he could receive today.

### B.     The *"Extraordinary and Compelling Reasons" Standard*

Even where, as here, a district court finds that a defendant has established "extraordinary and compelling reasons," the district court "is still not required to grant the defendant's motion for a sentence reduction. Rather, it must 'consider' the § 3553(a) sentencing factors 'to the extent that they are applicable' in deciding whether to exercise its discretion to reduce the defendant's term of imprisonment." *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021) (quoting 18 U.S.C. § 3582(c)(1)(A)) (cleaned up); *see also United States v. Hargrove*, 30 F.4th 189, 195 (4th Cir. 2022) ( noting that, even if a prisoner establishes "extraordinary and compelling circumstances," a district court is "not required to grant the defendant's motion for a sentence reduction."). Here, the Court concludes that the § 3553(a) factors weigh against granting a reduction in Carson's sentence.

First, the Court concludes that "the nature and circumstances of the offense and the history and characteristics of the defendant" weigh heavily against a reduction in Carson's sentence. *See* 18 U.S.C. § 3553(a)(1). In conjunction with this factor, it is appropriate to separately highlight the facts of the instant offense followed by an accounting of Carson's criminal history.

The instant offense conduct is outlined in Paragraphs 6–18 of the PSR. The Court incorporates these paragraphs in this order by reference. As outlined in detail

above, Carson approached his two co-defendants about participating in an armed robbery. Originally, he requested that they assist him in robbing a drug dealer, however, his plan soon evolved into armed bank robbery. His plan involved the use of both a stolen vehicle and a stolen firearm. During the robbery, the firearm was pointed at bank employees and customers—placing them in fear of their lives. After the robbery, Carson and his co-defendants dangerously lit the stolen vehicle on fire, causing it to explode and risking further harm to the public. They then led responding law enforcement officers on a dangerous highspeed chase, which ended in a crash. The three then fled the crash on foot, and the threat presented by their escape caused law enforcement to shut down businesses, neighborhoods, and two high schools. Law enforcement was required to marshal resources in order to conduct a manhunt for Carson and his co-defendants. During this manhunt, members of the public were placed in great fear of their personal safety. Ultimately, after several hours, Carson and a co-defendant were tracked down by a dog team, and his other co-defendant was found by utilizing a helicopter.

Turning to the second part of § 3553(a)(1), which looks at the "history and characteristics of the defendant," the Court will next review Carson's prior criminal history. 18 U.S.C. § 3553(a)(1). Before his instant federal convictions, Carson's significant—and violent—criminal history spanned over 20 years. In 1984, at the age of 16, Carson was convicted of misprision of a felony. PSR ¶ 43. The facts underlying the conduct related to this conviction warrant further discussion here and arose from two separate criminal incidents which occurred on the same day. On

December 14, 1983, Carson participated in the violent armed robbery of a victim at a gas station in Richland County, South Carolina. *Id.* According to the PSR, Carson did not fire the shots which killed the victim; however, he was present at the robbery and provided the shotgun which facilitated the robbery and killed the victim. *Id.* Later that day, at a second gas station, Carson fired the shotgun at a vehicle, which was occupied by a man and his son. *Id.* His shot hit the driver's side window of the vehicle. *Id.* Fortunately, both the man and his son were unharmed. *Id.* For this violent conduct, Carson was sentenced to a Youthful Offender Act sentence of 6 years suspended to 5 years' probation. *Id.* His probation was revoked two years later, and he was sentenced to one year of incarceration. *Id.*

In 1988, Carson was convicted of simple possession of marijuana, disorderly conduct, and unlawful possession of a razor. *Id.* ¶¶ 45–46. In 1989, he was convicted of driving under suspension which was followed by convictions in 1990 for trespassing, two separate counts of failure to stop on police command, and driving under suspension. *Id.* ¶¶ 47–50.

In 1993, Carson was convicted of his first ABHAN offense. *Id.* ¶ 51. This offense arose out of Carson *shooting* a victim in the right arm. *Id.* For this violent conduct, Carson was sentenced to 9 years confinement suspended upon service of 9 months followed by 5 years of probation. *Id.* Carson failed to abide by the terms of his probation by failing to report to his probation officer, testing positive for illegal drugs, and being terminated from rehabilitative programs. *Id.* His probation was revoked, and a 30-month revocation sentence was imposed. *Id.*

Before his probation was revoked on his first ABHAN conviction, Carson participated in the burglary of a commercial business in Columbia, South Carolina. *Id.* ¶ 52. He was convicted of this offense in 1995 and sentenced to 29 months imprisonment. *Id.*

In December 1997, Carson was caught unlawfully entering a commercial business in Columbia, South Carolina. *Id.* ¶ 53. The responding officers tried to apprehend him as he exited the business. *Id.* Instead of complying with the officers' orders to stop, Carson fled to the roof, causing damage to the premises. *Id.* Officers caught up to Carson, who assaulted them with an advertising sign while they were effecting a lawful arrest. *Id.* For this conduct, Carson was convicted of burglary, petit larceny, malicious injury to real property, and resisting arrest. *Id.* He was sentenced to four years of incarceration. *Id.*

In 1999, Carson received his second ABHAN conviction. *Id.* ¶ 55. This conviction arose out of an incredibly violent assault, which occurred from March 11, 1999 to March 12, 1999. *Id.* During this day-long assault, Carson choked the victim unconscious. *Id.* After she passed out, Carson tied her hands behind her back and placed her in a vehicle, kidnapping her. *Id.* When the victim regained consciousness, Carson again choked her and struck her with his fists. *Id.* For this incredibly violent offense, Carson was sentenced to 10 years provided upon the service of 4 years and 3 years' probation. *Id.* Notably, Carson was on probation for this conviction when he committed the instant armed bank robbery. *Id.*

After a review of the facts of the instant offenses along with Carson's criminal history, the Court concludes that the "the nature and circumstances of the offense" weigh heavily against a reduction in his sentence. *Contra Brown*, 2023 WL 5257673 at *7 ("While we do not make light of the serious conduct for which Brown was convicted, we cannot ignore the extraordinary fact that Brown . . . was not charged with causing any physical violence or injury"). Here, Carson committed an exceptionally violent crime and threatened his victims with physical harm and death. The conduct outlined makes it clear that Carson would pose a great risk to the public if the Court were to reduce his sentence. This conclusion is supported by Carson's willingness to commit violent acts despite repeatedly serving time in prison. Moreover, his past criminal history, when coupled with his prior failure to abide by the terms of his probation, shows a distinct lack of respect for the law. Accordingly, for the reasons stated, the Court concludes that § 3553(a)(1) weighs against a reduction in Carson's sentence.

The Court concludes that the next set of factors, which analyze the kinds of sentences available and the sentencing range established for a defendant's conduct, also weigh against a reduction in Carson's sentence. *See* 18 U.S.C. § 3553(a)(3)–(4). Carson was originally sentenced as an armed career criminal. As outlined above, if sentenced today, Carson would no longer be an armed career criminal and would face a lower Guidelines range on Counts 1 and 3. However, this factor alone is not an automatic basis for reducing his sentence. In fact, Carson could receive the original sentence imposed if he were sentenced today. This is because, if sentenced

today on Count 2, Carson would face a mandatory *minimum* of 84 months consecutive to any sentence imposed as to Counts 1 and 3. However, as stated earlier, the 84-month mandatory minimum on Count 2 is *only the minimum*. Carson could be sentenced *up to* a statutory *maximum* of Life on his § 924(c) conviction. As well, the Guidelines are advisory, leaving the Court discretion to impose the original sentence again.

As well, when considering Carson's extremely violent prior record in conjunction with the continued violence exhibited during the instant federal offenses, the Court concludes that the 84-month mandatory minimum sentence he would face on Count 2 today would be inadequate. This is best illustrated by the Court's previous upward departure at sentencing even though Carson was already being sentenced as an armed career criminal. It is reasonable to conclude an upward departure would be appropriate with the imposition of the 360-month sentence originally imposed in Carson's case. Accordingly, when considering the instant offense conduct and Carson's previously noted prior convictions, there is a limited basis to conclude that a lesser or significantly lower sentence would be imposed today. The Court concludes that §§ 3553(a)(3)-(6) do not weigh in favor of a either a reduction in Carson's sentence or his release.

The Court has carefully reviewed the records submitted by Carson in support of his argument that he has been successfully rehabilitated. The records reflect that Carson has completed programing and educational courses offered by the BOP. However, Carson's inmate discipline date reveals extensive disciplinary issues

while incarcerated. ECF No. 318 at 23. Specifically, Carson has received infractions for: (1) fighting with another person, (2) assaulting without serious injury, (3) disruptive conduct–greatest, (4) possessing an unauthorized item, (5) refusing to obey an order, (6) giving/accepting money without authority, and (7) refusing work/program assignment. *Id.* The Court concludes that these disciplinary infractions also weigh against release and show Carson's continuing disrespect for authority. In sum, Carson has committed serious offenses, including both the instant violent armed bank robbery and his past violent offenses—which involved Carson shooting unarmed victims and strangling a woman unconscious. He has continued to have disciplinary issues while incarcerated. Therefore, the Court concludes his rehabilitative efforts do not outweigh his repetitive contempt for the law which he exhibited before—and now during—his incarceration.

Finally, as noted in *McCoy*, the Fourth Circuit indicated that district courts should "conduct individualized inquires" and consider individual factors specific to each defendant when evaluating a motion for compassionate release. 981 F.3d at 288. Here, the Court has followed that guidance and has based its decision on the individualized considerations outlined herein. The offense conduct at issue is very serious. Carson participated in a violent armed bank robbery where he and his co-defendants brandished a stolen firearm and threatened to harm customers and employees. They burned a stolen vehicle, causing it to explode and placed communities in fear and at risk of harm during their escape from law enforcement. Carson's conduct was egregious, serious, and significant. When coupled with both

his exceptionally violent and extensive criminal record as well as his disciplinary record while incarcerated, the Court concludes that Carson would pose a substantial risk to the safety of the public if his sentence were reduced. That record, as outlined shows that Carson (1) provided a shotgun used to rob and kill a victim, (2) shot a person, which resulted in an ABHAN conviction, (3) burglarized a business and resisted arrest in that incident, and (4) kidnapped a victim, choked her into unconsciousness, and beat her with his fists, resulting in a second ABHAN conviction. Based on the above analysis, the Court finds that the § 3553(a) factors weigh heavily against Carson's request for relief and concludes that neither his release nor a reduction in his sentence are appropriate.

<u>CONCLUSION</u>

The Court finds that Carson's motion for compassionate release should be denied, for the reasons stated and based on an analysis and balancing of the § 3553(a) factors. The Court concludes that, if Carson were released, he would pose a significant risk to the public based on the extensive history of violent criminal outlined herein. Accordingly, it is the judgment of the Court that Carson's motion for compassionate release, ECF Nos. 310 & 311, is **DENIED**.

**IT IS SO ORDERED.**

*s/ Terry L. Wooten*
Terry L. Wooten
Senior United States District Judge

November 7, 2023
Columbia, South Carolina